<u>NOT FOR PUBLICATION</u>                    (Docket Nos. 85, 111)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| _____ : | |
| EQUAL EMPLOYMENT OPPORTUNITY : | |
| COMMISSION, : | |
| : | |
| Plaintiff, : | Civil No. 03-2796 (RBK) |
| : | |
| v. : | **OPINION** |
| : | |
| FOODCRAFTERS DISTRIBUTION : | |
| COMPANY, et al., : | |
| : | |
| Defendants. : | |
| _____ : | |
| EILEEN HORNER, et al., : | |
| : | |
| Intervenor Plaintiffs, : | |
| : | |
| v. : | |
| : | |
| FOODCRAFTERS DISTRIBUTION : | |
| COMPANY, et al., : | |
| : | |
| Intervenor Defendants. : | |
| : | |
| _____ : | |
| : | |
| MONIQUE LOVENDUSKI, : | |
| : | Civil No. 04-2394 (JEI) |
| Plaintiff, : | |
| : | |
| v. : | |
| : | |
| FOODCRAFTERS DISTRIBUTION : | |
| COMPANY, et al., : | |
| : | |
| Defendants. : | |
| _____ : | |

**KUGLER**, United States District Judge:

        This matter comes before the court upon motion by Defendants

Foodcrafters Distribution, Co., et al., ("Defendants") for summary judgment of the claims of Plaintiff Equal Opportunity Commission ("EEOC") and Intervenor Plaintiffs Eileen Horner, Danelle Horner (n/k/a Danelle Morgan), Dayna Horner, Leighanne Reynolds, and Paula Bobo (collectively, "Intervenor Plaintiffs"), and cross motions by the Intervenor Plaintiffs to amend the complaint and to consolidate this case with Lovenduski v. Foodcrafters Distributing Company, et al., 04-CV-2394 (JEI). For the reasons set forth below, Defendants' motion for summary judgment will be granted in part and denied in part, Plaintiffs' motion to amend the complaint will be denied, and Plaintiffs' motion to consolidate will be granted.

**I.   Background**

These motions address the sexual harassment and race and sex discrimination claims of several female employees of Foodcrafters Distribution, Co. ("Foodcrafters"), a trucking company with terminals in Cinnaminson and Pennsauken, New Jersey.[1] Because Plaintiffs' ability to surmount summary judgment of their claims depends in part on their subjective experiences at Foodcrafters, Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22 (1993), the

---

[1] Although Defendants state that "Leighanne Reynolds' claims of sexual and racial harassment should be dismissed," (Mot. at 38), they neither discuss Reynolds' claim of racial harassment, nor provide a legal basis for summary judgment of this claim. Accordingly, Defendants' motion for summary judgment of Reynolds' allegations of racial harassment will be denied.

allegations of each Plaintiff are provided separately below.[2]

## A.   Eileen Horner

Eileen Horner began her career with Foodcrafters when it purchased the assets of her previous employer, Sunland Distributors, Inc. ("Sunland"), in December 1999. After the purchase, Foodcrafters hired Eileen Horner along with several other former Sunland employees, including Steve Scarani ("Scarani") and Al Avila ("Avila"), to continue working in the trucking terminals. In April 2001, Eileen Horner threatened to resign from her position, allegedly because she found the work environment to be hostile. She remained at Foodcrafters because Michael Alfano ("Alfano"), a manager ordinarily stationed at the Florida office, gave her a raise and promised her that the conditions would be remedied. (Mot. at 9.) The working environment allegedly did not improve, and Eileen Horner left Foodcrafters in April 2002.

Eileen Horner describes numerous incidents of harassment involving several Foodcrafters employees, in particular Avila, Ken Brandt ("Brandt"), and Scarani. She claims that Avila made repeated sexual and derogatory comments towards women, including

---

[2] The following facts are taken from Defendants' statement of undisputed fact, filed pursuant to Local Rule 56.1, and Plaintiffs' response to Defendants' statement of fact and counterstatement of disputed and undisputed material fact. Defendants did not respond to or oppose Plaintiffs' statement and counterstatement of undisputed fact.

the statement that "women are only good for one thing: sex." (Mot at 7, 8.) Avila also publicly discussed the breast size of a sales woman in the office, made comments about "what [he] would do with a woman like that," and announced that he did not "get any anymore." (Mot. at 10.)

In discussing the hiring process with Eileen Horner, Avila informed her that "he hired women according to their breast size, hair color (he preferred blondes) and their figures," and he made comments such as "[d]on't hire her, she's too big," "she's a size 4," and "I didn't know you hired the hot blonde one." (Pls.' Facts at 22-23.) Avila allegedly hired a woman with no trucking experience, explaining his decision to Eileen Horner on the grounds that the new hire had large breasts and "made for great scenery," and that "he would train her every day, as long as he kept on getting to look at her." (Pls.' Facts at 23.) Eileen Horner also claims he refused to hire a black female applicant, stating that "black women 'stink'" and that he would not train or work with her. (Pls.' Facts at 24.)

Eileen Horner claims that Brandt made numerous comments about her appearance, including that she looked "sexy," "looked good in jeans," and had "a great body for a 45 year old woman." (Mot. at 10.) On one occasion, he allegedly told her that they should purchase a case of beer and "party on the dock, all night long." (Pls.' Facts at 30.) Other employees told her that Brandt

4

stared at her buttocks and made comments "in a low tone in a
perverted nature." (Mot. at 10.) Eileen Horner claims also that
dock workers under Brandt's supervision referred to Eileen Horner
as a "MILF," which stood for "Mother I Would-Like to F**k."
(Pls.' Facts at 30.) In addition, Brandt continuously made
"sexually charged comments generally directed to office staff,"
(Mot. at 10), and when Eileen Horner asked if he ever said
anything clean Brandt replied, "No, I live for sex." (Pls.' Facts
at 31.)

Eileen Horner also recounts a specific incident involving
Foodcrafters employee William Walker ("Walker"). Evidently Walker
entered the office while intoxicated and told Eileen Horner that
she was "sexy," his type of woman, and that he wanted to hug her.
(Mot. at 10.) He then tried to grab Eileen Horner's daughter and
fellow employee, Dayna Horner, told her she looked "hot" and
"sexy," and hugged her and kissed her hand. (Mot at 10.)
Foodcrafters terminated Walker's employment, approximately a week
after the incident, though it is disputed whether he was
terminated because of his harassment or because he was
intoxicated while at work.

Eileen Horner also alleges that Scarani openly discussed his
sex life and made "sexual perverted comments" over the phone in
the main office where Eileen Horner worked. She claims he ignored
her requests that he have his conversations elsewhere. (Mot. at

5

8.)

Eileen Horner testifies that she brought the conduct to the attention of supervisors and made various other attempts to stop the alleged harassment, to no avail. She contends that Brandt was never reprimanded for his conduct, even though she complained about him on a regular basis to Avila and Alfano. (Pls.' Facts at 41.) She claims further that Alfano responded to her complaints by saying that the girls had to be thick skinned because they were in the trucking industry. (Pls.' Facts at 41.)

The record suggests that Eileen Horner herself was not entirely innocent of inappropriate workplace behavior. While at Sunland, Eileen Horner participated in procuring a private striptease dancer for her boss Guy Wortleman's birthday. The extent of her participation in the incident is disputed, and she asserts that her sole involvement was that she "may have made a call to local birthday people that provide this, but I did not make the arrangements." (Pls.' Facts at 2.) It is undisputed, however, that Eileen Horner sent a birthday card to Alfano while she was working for Foodcrafters. The front of the card displays a photograph of a scantily clad woman and the text: "Happy Birthday, Big Boy! If you want a night of lust and debauchery, I can come over . . ." The text on the inside of the card reads: ". . . and help you inflate your date." Eileen Horner altered the word "I" on the front of the card to read "We," and the card was

6

signed by Eileen and Danelle Horner and another employee.

**B.    Danelle Horner**

Foodcrafters hired Danelle Horner, the daughter of Plaintiff Eileen Horner, as a customer service representative in October 2000. She initially resigned from her position in August 2001 and later resumed employment on a part-time basis, resigning again by letter dated April 26, 2002.

Danelle Horner states that sexual jokes and comments were a daily occurrence in the office. (Pls.' Facts at 20.) In particular, she alleges that Alfano once took off her shoe and tried to rub her foot until she yelled "stop" and started crying, and that he told her both in person and over the phone that she needed to "get laid" and that "getting a piece of ass would be the solution to all [her] problems." (Mot. at 8, 12; Pls.' Facts at 4, 7.) On another occasion, Alfano told her that her breasts were not big enough and that he would take up a collection for her to get breast implants, as long as he would be allowed to feel them. (Mot. at 13.)

Danelle Horner also describes a bet made with Alfano during the basketball playoffs requiring the loser of the bet to wear the opposing team's basketball jersey to work. Alfano allegedly asked her to wear the jersey with nothing on underneath and said he would buy it from the childrens' department so it would be extra small. (Mot. At 12; Pls.' at 7.) She protested that she

would not wear the jersey, and Alfano responded by reminding her that he does payroll. (Pls.' Facts at 27.)

Danelle Horner lists several incidents of misconduct by Avila including one occasion when he made gestures about a woman with big lips, "intimating that she would be good at giving 'blow jobs,' a reference to oral sex." (Pls. Facts at 9.) She claims that when she would wear skirts, "Avila would comment on how her legs were, how nice she looked, how she got dressed up for him and how she looked sexy," and also stated that it was going to be a "long hot summer with her." (Pls.' at 20.) Danelle describes a particular incident when a woman who was beaten up by a truck driver entered the office asking for assistance. (Mot. At 13.) She claims that Avila responded to the situation by commenting that:

> the woman got a golden shower, but not the right way, a reference to a perverted sexual act . . . In response to the woman's plea for help, Al Avila commented that she 'probably beat herself up,' 'she's nothing but trash,' 'women need to be smacked around,' 'they need to be put in their place,' and that 'they [women] are only good for one thing.'

(Pls.' Facts at 8.)

Danelle Horner alleges that she reported some of the incidents to managers, but her complaints were unsuccessful. For example, she claims that Brandt made a comment in German, which was translated by coworker Lovenduski, who could also speak German, to mean "pull down my pants and sit on his face." (Mot. at 14.) She reported the comment to Alfano, but Alfano "thought

8

the comment was absolutely hysterical." (Pls.' Facts at 32.) She also told Alfano about Scarani's lewd phone conversations, but the conversations continued. (Pls.' Facts at 28.)

In addition to her harassment claims, Danelle Horner alleges disparate treatment on the grounds that she was barred from applying for a dispatcher position at Foodcrafters in December 2001. Allegedly Avila and Alfano both told her that she could not apply for the position because, as a woman, she was "not geographically inclined" and because the drivers would not like taking orders from a woman. (Mot. at 14; Pls.' Facts at 38.) Alfano also told her that she could nevertheless get the position by sleeping with the owner of the company. (Pls.' Facts at 39.) Foodcrafters hired a man for the position. The new hiree quit after three weeks, and Danelle Horner again asked if she could apply, and was again denied. Roche told Danelle at a meeting that "if she was willing to 'cross the fence' he would teach her the position," but Foodcrafters again hired a man to fill the position. (Pls.' Facts at 38.)

**C.  Dayna Horner**

Foodcrafters hired Plaintiff Dayna Horner, the daughter of Plaintiff Eileen Horner and the sister of Plaintiff Danelle Horner, in September 2001, to perform data entry and filing tasks. (Mot. at 16.) At the time, Dayna Horner was a sixteen year old high school student. She resigned in April 2002, at the same

time as her sister.

Dayna Horner alleges specific incidents by various employees, including the previously-described situation involving Walker; however, most of Dayna Horner's allegations relate to behavior by Brandt. In particular, she contends that Brandt made sexually inappropriate comments and jokes daily, and she states that "Ken Brandt, day-to-day, every day, every second, every time you saw him, every word that came out of his mouth was sexual." (Pls.' Facts at 12, 32.) She also alleges that Brandt made comments about what she was wearing and said she looked "sexy" and "hot today." (Mot. at 17.) Dayna Horner describes a specific incident when she told Brandt that she would hit him if he continued to bring her stacks of weight tickets to work on, and Brandt responded, "Oh, baby, you're getting me aroused, don't leave me hanging like that, don't make promises that you can't keep." (Pls.' Facts at 31.) She claims that Brandt's conduct continued, even after she asked him to stop his inappropriate behavior, (Pls.' at 12.), and she alleges that Brandt hugged her and her sister in a suggestive and inappropriate manner after they quit their jobs.

**D.   Leighanne Reynolds**

Foodcrafters hired Leighanne Reynolds ("Reynolds") as an office assistant on February 27, 2002. After Eileen Horner resigned, Foodcrafters hired nighttime manager Sadie Robertson to

10

take her place, but Reynolds did not get along with Robertson. (Mot at 20.) Reynolds ultimately resigned on or around May 13, 2002.

The record suggests that Reynolds' time at Foodcrafters was suffused with harassment, much of which was related to her side work as a private dancer. Although Reynolds' disputes the extent of her dancing, (Pls.' Facts at 14), Avila allegedly told the dock workers and drivers that Reynolds was a part-time private dancer, resulting in a number of harassing and suggestive comments directed towards Reynolds. (Pls.' Facts at 21.) Reynolds recalls that Brandt once asked her if she would go to his house and dance on his pool table. (Mot. at 19.) On another occasion, Brandt told her that if he had $200.00 in his pocket he would love to see her take off her clothes. (Mot. at 19.)

Reynolds also recounts statements made after her coworkers discovered that she has a biracial son. In particular, she alleges that Brandt told a joke about a black man raping a white woman, and called Reynolds a "waste of a good white woman." (Mot at 19; Pls.' Facts at 34.) After Foodcrafters hired a black dock worker, Brandt "commented that they had to keep Reynolds off the dock because he [the new employee] was black," and Reynolds would be "salivating." (Pls.' Facts at 34.) Avila also reacted negatively upon learning that Reynolds' son was bi-racial, and admitted that his attitude toward her changed. (Pls.' Facts at

11

25, 26.) He also made a number of comments that he (Avila) was "the wrong color," (Mot at 19; Pls.' at 25), and referred to Reynolds as "a waste of a blonde." (Pls.' Facts at 26.)

Reynolds also alleges harassment aside from the incidents related to her dancing and her son. In particular, she claims that Avila would "gawk" at her, stare at her buttocks, comment on her tight jeans, and touch her toes. (Mot. at 19, 20; Pls.' Facts at 21.) Avila allegedly referred to her as a "dumb blonde" and "trashy," and stated that he did not want her employed at Foodcrafters. (Pls.' Facts at 15.) Reynolds claims that she often overheard Brandt discussing his sex life, that Brandt made sex comments every day, and that "that's all you heard all day." (Mot. at 19; Pls.' Facts at 14, 33.)

### E.   Paula Bobo

Foodcrafters hired Paula Bobo ("Bobo") on February 23, 2001, to fill a part-time data entry position on Friday nights. She also worked Tuesday evenings for a period during her employment. She resigned May 10, 2002.

Bobo claims Avila and Alfano made comments about how good she looked and would "laugh and giggle while staring at her body." (Mot. at 22; Pls.' Facts at 17.) Upon "learning that Paula Bobo was engaged, Avila told her that she must be 'putting out' pretty good to get the diamond that she did." (Pls.' Facts at 21.) She recounts a conversation with Brandt on one occasion

12

where Brandt told her that his girlfriend was not upset that he did not have money because "as long as I bring a bottle of wine and my dick works, she's fine." (Pls.' Facts at 33.)

Bobo also describes two separate encounters with Foodcrafters truck drivers. In the first incident, she claims that driver Jerry Jobe grabbed and tickled her neck and told her that he remembered the first time she "turned him on." (Mot. at 22; Pls.' Facts at 17.) In the second incident, driver Robert Tull referred to Sadie Robertson as the "big ass black mama." (Mot. at 23.) He then looked at Bobo and said she had a "black woman's ass that was good for fucking doggy style," and pantomimed the act. (Mot. at 23; Pls.' Facts at 18.)

Bobo also claims that she was offended by harassment directed towards other employees, for example when she overheard the basketball jersey bet between Danelle Horner and Alfano, and when Alfano teased Danelle Horner about her breast size. (Mot. at 12, 22, 23.) Bobo claims that this kind of discussion "was a constant." (Pls.' at 27.) Bobo also alleges that there was a drawing of a penis on the wall near the time clock in the Pennsauken terminal. (Pls.' at 23.)

**F.   Procedural History**

The Intervener Plaintiffs filed charges of discrimination with the EEOC on September 20, 2002. The EEOC filed a lawsuit before this court on Jule 11, 2003, against Foodcrafters,

13

Tropical Plant Carriers, Inc., and Little Brownie Properties, Inc. Upon receiving permission to intervene, the Intervener Plaintiffs filed a Complaint on August 21, 2003, adding as Individual Defendants Foodcrafters President Robert Roche ("Roche"), Little Brownie Properties President John P. Brown ("Brown"), and TSI President Peter Wood ("Wood"), Alfano, and Avila, (collectively, "Individual Defendants"). Defendants now move for summary judgment of all claims. Plaintiffs cross move to amend their Complaint and to consolidate their claim with that of Monique Lovenduski, currently pending before the Honorable Joseph E. Irenas.

## II.  Standard

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could find for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Celotex, 477 U.S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential

14

element of the nonmoving party's claim; or (2) demonstrating to
the Court that the nonmoving party's evidence is insufficient to
establish an essential element of the nonmoving party's case.
Id. at 331. If the moving party has not fully discharged its
initial burden, its motion for summary judgment must be denied.
Id. at 332. If the moving party satisfies its initial burden, the
nonmoving party "must set forth specific facts showing that there
is a genuine issue for trial." Fed. R. Civ. P. 56(e).

**III. Analysis**

**A.   Aiding and Abetting**

Although individuals in supervisory positions are not
personally accountable as employers under the New Jersey Law
Against Discrimination ("NJLAD"), they can be individually liable
for aiding and abetting discriminatory or harassing conduct
pursuant to N.J.S.A. 10:5-12e. Tarr v. Ciasulli, 181 N.J. 70,
82-83 (2004).[3] The Intervener Plaintiffs contend that the
Individual Defendants' failure "to take any action in response to
the Intervener Plaintiffs' repeated pleas for assistance" is
cognizable as aiding and abetting under the statute. (Inter.
Pls.' Opp'n. at 9.)

To establish aider and abetter liability, the plaintiff must

---

[3] N.J.S.A. 10:5-12e makes it unlawful "[f]or any person,
whether an employer or an employee or not, to aid, abet, incite,
compel or coerce the doing of any of the acts forbidden [under
the LAD]."

show that (1) the party defendant aided performed a wrongful act
that caused an injury; (2) the defendant was "generally aware of
his role" as part of the tortious activity "at the time that he
provides the assistance"; and (3) the defendant knowingly and
substantially assisted the violation. Tarr, 181 N.J. at 84
(quoting Hurley v. Atlantic City Police Dept., 174 F.3d 95, 127
(3d Cir. 1999)(citations omitted)). Consistent with Restatement
(Second) of Torts § 76(b) (1979), courts look to five factors to
determine whether a defendant provides "substantial assistance":

> (1) the nature of the act encouraged, (2) the amount of
> assistance given by the supervisor, (3) whether the
> supervisor was present at the time of the asserted
> harassment, (4) the supervisor's relations to the
> others, and (5) the state of mind of the supervisor.

Id. at 84-85 (citing Rest. 2d Torts, supra, § 876(b) comment d).

Courts have yet to clarify the extent to which a supervisor
is personally liable for his failure to prevent harassment and
discrimination in the workplace. On the one hand, the New Jersey
Supreme Court has established conclusively that aiding and
abetting requires some "active and purposeful conduct." Tarr v.
Ciasulli, 181 N.J. at 82-83 (reasoning that dictionary
definitions and the juxtaposition of "aid" and "abet" with
"incite," "compel," and "coerce" requires some form of active
assistance). Consequently, the plaintiff must show that the
defendant "knowingly and substantially" assisted the wrongdoer;
mere negligent supervision is not enough. Id. at 85 (holding that

16

defendant could not be liable for lack of evidence that he "encouraged any of the wrongful conduct against plaintiff, that he assisted the wrongdoers, or that he was even present when the wrongful conduct occurred").

On the other hand, inaction can be sufficient to establish liability where "it rises to the level of providing substantial assistance or encouragement." Hurley, 174 F.3d at 126 (quoting Failla v. City of Passaic, 146 F.3d 149, 158 (3d Cir. 1998)) (holding that supervisor could only be liable for failure to accommodate disabled employee if he knew the failure to accommodate was a breach of his employer's duty *and* "if his inaction actually assisted or encouraged the unlawful act"). Because a supervisor has "a duty to act against harassment" under New Jersey law, deliberate indifference to harassment can rise to the level of aiding and abetting. Hurley, 174 F.3d at 126. Thus, in Hurley, the Third Circuit held that the supervisor could be liable as an aider and abetter in part because "[a]s part of the chain of command that [plaintiff] was expected to follow, he controlled her access to the most effective potential solutions to the harassment," but "laughed" at her complaints and personally participated in the harassment. Hurley, 174 F.3d at 127.

Consistent with the evidentiary record, the Court will grant summary judgment as to Defendants Wood and Brown and will deny

17

summary judgment as to Defendant Roche.[4] Plaintiffs' allegations against Wood and Brown are limited to single incidents: Plaintiffs claim that Brown was present when employee Michael Crull informed Roche of the harassment problems in the Foodcrafters terminals, (Pls.' Facts ¶ 146), and that Wood attended the meeting where Danelle Horner complained that she was not permitted to apply for the dispatcher position. (Inter. Pls.' Opp'n. at 9.) These facts alone do not amount to a claim that Wood and Brown substantially assisted or encouraged the harassing conduct. Furthermore, Plaintiffs provide no evidence that Wood, as president of Transystems, Inc., bore any responsibility to address personnel conflicts in the trucking terminals or otherwise neglected a duty to personally intervene.

Plaintiffs' allegations against Roche are somewhat more substantial. In particular, Plaintiffs provide evidence that Roche knew of the harassment in the Foodcrafters terminals, and knew that Danelle Horner was told she could not apply for a dispatcher position because of her gender. The record suggests further that Roche was often unresponsive to Plaintiffs' direct appeals to remedy the harassing environment. (Pls.' Facts at ¶ 145, 147.) Like the defendant police captain in Hurley, Roche held a supervisory position that imposed on him a duty to respond

---

[4] Defendants do not request summary judgment of Plaintiffs' claims against Avila or Alfano, and are therefore not entitled to summary judgment of those claims.

to Plaintiffs' complaints and address workplace abuses. Also as in <u>Hurley</u>, the record suggests that Roche himself participated in the abusive conduct. (Pls.' Facts at ¶ 148.) Although aider and abetter liability cannot attach for one's own harassing conduct. <u>See</u> <u>Harmon v. Bemis Co., Inc.</u>, 2005 WL 1389174, *10 (N.J. Super. L. 2005) (noting that one "cannot aid and abet his own wrongful conduct") (citing <u>Newsome v. Administrative Office of the Cts.</u>, 103 F. Supp. 2d 807, 823 (D.N.J. 2000)), Roche's treatment of the female employees could easily have encouraged the harassing conduct of his subordinates, establishing that "harassing women was part of" the trucking environment. <u>See</u> <u>Hurley</u>, 174 F.3d at 127.

Although the evidence against Roche is by no means conclusive, Plaintiffs have presented a material question of fact as to whether Roche substantially assisted and encouraged the harassment. Accordingly, summary judgment will be granted as to Plaintiffs' claims against Wood and Brown, and will be denied as to Plaintiffs' claims against Roche.

**B. Hostile Work Environment Claims**

To establish a claim for "hostile work environment sexual harassment" under Title VII,[5] the plaintiff must demonstrate that

---

[5] Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

she (1) "suffered intentional discrimination because of [her] sex;" (2) the discrimination was "severe or pervasive";[6] "(3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990). Defendants argue that the alleged conduct is not sufficiently severe or pervasive to constitute a Title VII or NJLAD violation, particularly in the context of a workplace environment such as a trucking terminal.

1.   **Objective Factor**

Defendants argue correctly that merely offensive conduct does not constitute unlawful harassment. As the Supreme Court cautions in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), courts must take care to avoid applying Title VII as a "general civility code" to address "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Id. at 788. Thus,

---

[6] In Jensen v. Potter, Slip Op. filed January 31, 2006, at n.3, the Third Circuit definitively adopted the Supreme Court's "severe or pervasive standard." Id. (emphasis in original) (citing Pa. State Police v. Suders, 542 U.S. 129, 133 (2004)). Prior to Jensen, the Third Circuit oscillated between a "severe or pervasive" and a "pervasive and regular standard." Abramson, 260 F.3d at 277; Bouton v. BMW of N. Am., Inc., 29 F.3d 103, 106 n. 2 (3d Cir. 1994); Spain v. Gallegos, 26 F.3d 439, 449 n. 14 (3d Cir. 1994); but see Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 667 (3d Cir. 1999) (articulating a "pervasive or severe" standard).

the "mere utterance of an ethnic or racial epithet,"
"[d]iscourtesy or rudeness," and "simple teasing, offhand
comments, and isolated incidents (unless extremely serious)"
typically do not rise to the level of a Title VII or NJLAD
violation because they do not "alter the terms and conditions of
employment." Id. at 787, 788; see also Kidd v. MBNA Am. Bank,
N.A., 93 Fed. Appx. 399 (3d Cir. 2004) (holding isolated
incidents by single co-worker insufficient to establish hostile
work environment).

However, summary judgment is inappropriate in the face of
evidence that the "workplace is permeated with discriminatory
intimidation, ridicule, and insult that is sufficiently severe or
pervasive to alter the conditions of the victim's employment and
create an abusive working environment." Abramson v. William
Paterson College of New Jersey, 260 F.3d 265 278-79 (3d Cir.
2001) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21
(1993); see also Aman v. Cort Furniture Rental Corp., 85 F.3d
1074, 1081 (3d Cir. 1996) (reversing entry of summary judgment
for defendant); Faragher, 524 U.S. at 775 (holding that episodes
of uninvited touching, lewd remarks, and offensive comments about
women could constitute sexual harassment).

Taking the evidence in the light most favorable to
Plaintiffs, the record presents an image of the Foodcrafters
trucking terminal as a workplace regularly permeated with sexual

comments by employees and supervisors. Plaintiffs' testimony suggests that harassing and demeaning statements and sexually inappropriate incidents were a daily occurrence, unaddressed by Foodcrafters supervisors, and each Plaintiff has provided evidence that she personally experienced severe or pervasive misconduct. Bobo alleges that sexual discussion "was a constant," (Pls.' Facts at 27), and Dayna Horner and Reynolds both stated, respectively, that Brandt made sexual comments "day-to-day, every day," (Pls.' Facts at 12), and that "that's all you heard all day." (Mot. at 19; Pls.' Facts at 14, 33.)

Defendants march through the alleged incidents one by one to conclude that the conduct was mere "boorish," "crass," or "obnoxious horseplay" that could not rise to the level of harassment. (Mot. at 33-34.) Courts have consistently rejected such an approach. See e.g., Hurley v. Atlantic City Police Dept., 933 F. Supp. 396, 402 (D.N.J. 1996) (referring to behavior as "childish" "ignored the misogyny that pervaded [plaintiff's] working environment [and] underestimated its hurtfulness"). Such a piecemeal analysis fails to consider the behavior in the context of the sliding scale of pervasive or severe conduct. While a single incident may be sufficiently severe to state a claim, Taylor v. Metzger, 152 N.J. 490 (N.J. 1998) (holding single uttered racial epithet sufficient to survive summary judgment of NJLAD harassment claim), several incidents of less

egregious circumstances may be sufficiently pervasive to surmount the threshold, <u>Aman</u>, 85 F.3d at 1082 (holding that frequent racist remarks, such as referring to black plaintiffs as "another one," "one of them," "that one in there," and "all of you" is adequate to survive summary judgment).

Defendants contend that Plaintiffs' allegations were based on what they overheard rather than comments made directly to them, and that incidents were dealt with "swiftly and conclusively." (Opp'n. at 31.) However, Defendants provide no grounds for concluding as a matter of law that an overheard statement cannot constitute harassment. Similarly, while there are indications that Defendants did respond to some of the incidents, by terminating Walker and demoting Scarani, for example, the weight of the record suggests that most complaints went unaddressed.

Defendants are also correct that the alleged harassment must be evaluated with regard to "the social context in which particular behavior occurs and is experienced by its target." <u>Oncale v. Sundowner Offshore Serv., Inc.</u>, 523 U.S. 75, 81-82 (1998). Thus, as the Supreme Court has explained, "A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field--even if the same behavior would reasonably be experienced as abusive by the coach's

23

secretary (male or female) back at the office." Id. Courts should look to the "constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed," and employ "common sense" to distinguish between "simple teasing or roughhousing" and "conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." Id. at 82.

Defendants argue that the severity of the alleged misconduct was mitigated by the fact that it transpired in a trucking terminal, an environment plaintiffs knew to be "rough talking." Defendants emphasize that Plaintiffs often engaged in friendly and sometimes personal conversation with the alleged harassers, providing a context for the allegedly inappropriate conduct. However, because these arguments present questions of fact, and because the evidentiary record would nevertheless permit a jury to find that the conduct would detrimentally affect a reasonable woman, even in the context of a trucking terminal, Defendants are not entitled to summary judgment.

## 2.   Subjective Factor

Defendants argue that Plaintiffs did not establish that they subjectively perceived the environment to be hostile or abusive. See Faragher, 524 U.S. at 787 (noting that harassment must be "both objectively and subjectively offensive, one that a

24

reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so") (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22 (1993). Although the victim need not suffer any damage to her psychological well-being, the plaintiff must provide evidence that she was detrimentally affected by the conduct. Spain v. Gallegos, 26 F.3d 439, 449-50 (3d Cir. 1994).

In support of their motion, Defendants emphasize that at least some Plaintiffs had also behaved inappropriately, suggesting that they did not consider the environment abusive. In particular, Defendants point to Eileen Horner's participation in the acquisition of a "private dancer" for Guy Wortleman's birthday and the card Eileen Horner and Danelle Horner signed and sent to Alfano. Defendants also note that Eileen Horner hired her two daughters and other acquaintances to work at Foodcrafters, implying that she did not feel harassed.

Despite the evidence of Plaintiffs' own misbehavior, a reasonable jury could nevertheless find that Plaintiffs felt abused and upset by Defendants' conduct. In addition to their own statements in deposition, Plaintiffs provided medical reports from Robert M. Toborowsky, M.D., P.C., and Michele Paludi, Ph.D., indicating that the alleged harassment detrimentally affected them. Because Plaintiffs present a material question of fact, Defendants are not entitled to summary judgment of Plaintiffs'

25

hostile work environment claims.

**C.    Disparate Treatment Claim**

In addition to her claim of harassment, Plaintiff Danelle Horner alleges that Defendants prevented her from applying for a dispatcher position because of her gender.[7] Defendants contend that she was not qualified and did not actually apply for the position, precluding her claim for relief.

Analysis of a disparate treatment claim mirrors the framework for claims of racial discrimination articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-05 (1973). See, e.g., Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 281-82 (3d Cir. 2001). To establish a prima facie case, the plaintiff must demonstrate: (1) she is a member of a protected class; (2) she was qualified for the job and nonetheless suffered an adverse employment action; and (3) nonmembers of the protected class were treated more favorably. Id. (citing Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 318-19 (3d Cir. 2000). If the plaintiff establishes the three factors, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the adverse employment decision. Abramson, 260 F.3d at 281-82. The plaintiff must then

---

[7] Dayna Horner also claims disparate treatment, alleging that she was paid less than a similarly situated male coworker of the same age. Because Defendants do not address Dayna Horner's allegations in their motion, Defendants are not entitled to summary judgment of Dayna Horner's disparate treatment claim.

demonstrate that the proffered reason was "merely a pretext for unlawful discrimination." Goosby, 228 F.3d at 319. To overcome Defendants' motion for summary judgment, Plaintiffs need only demonstrate that a material question of fact exists as to the presence of each factor. Abramson, 260 F.3d 265.

Danelle Horner claims that she did not apply for an open dispatcher position because Alfano and Avila told her that her gender rendered her unsuitable for the job. In particular they stated that because she was a woman she was "not geographically inclined" and that the drivers would not like taking orders from a woman. (Pls.' Facts at ¶ 102-04.) After the issue of discrimination was raised at a meeting, Roche said that she was not qualified for the position because she did not know how to drive a tractor, though Plaintiffs claim this was not a necessary prerequisite to the position. He also stated that he would train her if she was willing to "cross the fence." (Pls.' Facts at ¶ 105-06.) Danelle Horner allegedly asked if she could apply for the position not once, but twice, after the man hired to fill the job quit after three weeks. (Pls.' Facts at ¶ 103-04.)

Defendants contend that Danelle Horner never applied for the dispatcher position and therefore did not experience an "adverse employment action." Defendants also provide a legitimate non-discriminatory reason for their action on the basis that Danelle Horner was not qualified for the position since was not a full

time employee, had never worked alone in dispatch, and had no actual experience.

The United States Supreme Court has held that there are some situations where an actual application is unnecessary to sustain a disparate treatment claim. In particular, an application may be unnecessary "when it would simply constitute a 'futile gesture' or a 'vain gesture' in light of employer discrimination." <u>Brown v. Coach Stores, Inc.</u>, 163 F.3d 706, 711 (2d Cir. 1998) (quoting <u>International Bd. of Teamsters v. United States</u>, 431 U.S. 324, 365 (1977)). To succeed, however, the "plaintiff carries the 'not always easy burden' of showing that he or she would have applied for a job had it not been for the company's deeply entrenched discriminatory practices." <u>Id.</u> (quoting <u>Teamsters</u>, 431 U.S. at 368).

Plaintiff has provided sufficient evidence to suggest that she actually would have applied for the position had it not been a vain gesture. Moreover, the facts surrounding Danelle Horner's qualifications are in dispute: Plaintiffs claim that her request for a full-time position was denied under suspicious circumstances and that she was learning the dispatch system by assisting Avila when there was no dispatcher. (Pls.' Facts at 9-10, ¶ 99.) Because there exist factual disputes as to whether Danelle Horner was qualified for the dispatch position and whether an application would have been futile, summary judgment

28

must be denied.

**4.   Constructive Discharge**

A claim for constructive discharge may exist where an "employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984); Nolan v. Cleland, 686 F.2d 806, 813 (9th Cir. 1982) (permitting constructive discharge claim for continuous pattern of discriminatory treatment over a number of years). To survive summary judgment, the plaintiff must "set forth sufficient facts so that a reasonable jury could conclude that her decision to leave was reasonable based upon the history of discriminatory treatment." Aman, 85 F.3d at 1084. Because the test is objective, the plaintiff must further establish that "'the conduct complained of would have the foreseeable result that . . . a reasonable person in the employee's shoes would resign.'" Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993) (quoting Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir. 1992)).

Defendants argue that the Plaintiffs quit their jobs for reasons other than the alleged harassment. In particular, they contend that Eileen Horner resigned to operate her own business, Danelle Horner quit to take a vacation, Reynolds resigned because of conflicts with a new office manager, and Bobo resigned because

29

Reynolds left. (Mot. at 1, 8, 23.) While there is some evidence supporting these arguments, Plaintiffs have also presented evidence that they did indeed resign because of the hostile work environment. (Pls.' Facts at 5, 6, 13, 18.) Because there is a material factual dispute as to Plaintiffs' motives for leaving Foodcrafters, Defendants' motion for summary judgment must be denied.

Defendants also argue that some Plaintiffs continued working even after professing that the conditions were intolerable. However, continuing to work in a hostile environment does not preclude a constructive discharge claim since a "jury could conclude that the conditions of her employment were intolerable, and that while she had the fortitude to stay, her strength finally failed." Aman v. Cort Furniture Rental Corp., 85 F.3d at 1084-85 (noting that Third Circuit has rejected an "aggravated circumstances" requirement and a history of discrimination would permit a plaintiff to conclude "that she simply had had enough").

Accordingly, summary judgment of Plaintiffs' constructive discharge claims will be denied.

## 5.   Punitive Damages

Defendants move for summary judgment of Plaintiffs' demand for punitive damages on the grounds that the alleged conduct does not rise to the level of egregiousness necessary to justify an award of punitive damages.

As Defendants contend, a claim for punitive damages must meet "a greater threshold than mere negligence." Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 624-25 (1993). Victims of workplace discrimination are entitled to punitive damages under the NJLAD only when they can demonstrate (1) "actual participation in or willful indifference to the wrongful conduct on the part of upper management" and (2) "proof that the offending conduct [is] 'especially egregious.'" Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 113 (1999) (quoting Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587 (1993)). Conduct that is "intentional, malicious, and 'evil-minded,'" Hurley, 174 F.3d at 124 (quoting Gares v. Willingboro Twp., 90 F.3d 720, 728 (3d Cir. 1996)), or done "with knowledge of a high degree of probability of harm and reckless indifference to consequences," Rendine, 661 A.2d at 1215, meets the egregiousness standard.

Plaintiffs have provided sufficient evidence such that a jury could find that upper management was willfully indifferent to the pervasive atmosphere of discriminatory and harassing conduct at the Foodcrafters terminals. The record indicates that members of upper management, such as Roche, actively participated in the sexual harassment, and that management was well-aware of the misconduct and nevertheless failed to take any action to remedy the abuse. (Pls.' Facts at ¶ 145-148.) Accordingly, Defendants' motion for summary judgment must be denied.

31

IV.    Motion to Amend

Plaintiffs request permission to amend their Complaint to add as new Defendants Little Brownie Brokers and Flying Angels, Inc., on the basis that they are intertwined with Defendants Foodcrafters, Tropical Plant Carriers, Inc., Transsystems, Inc., and Little Brownie Properties, Inc., as a single employer.

After a responsive pleading has been filed, "a party may amend the party's pleading only by leave of court." Fed. R. Civ. P. 15. Such leave "shall be freely given when justice so requires," but is subject to the sound discretion of the district court. Id.; Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330 (1971); Cureton v. National Collegiate Athletic Ass'n, 252 F.3d 267, 272-73 (3d Cir. 2001). In determining whether to grant leave to amend, the court should consider any "bad faith, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, and futility of the amendment." Foman v. Davis, 371 U.S. 178, 182 (1962).

Although "[t]he passage of time, without more, does not require that a motion to amend a complaint be denied . . . at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." Adams v. Gould, Inc., 739 F.2d 858, 868 (3d Cir. 1984). Thus, a motion to amend may be

32

reasonably denied if the case is approaching trial, <u>Lindquist v.</u> <u>Buckingham Twp.</u>, 2004 U.S. App. LEXIS 14922, 17-19 (3d Cir. 2004), where the amended complaint would raise new facts and require additional discovery, <u>Richardson v. Frank</u>, 1989 U.S. Dist. LEXIS 13355 (E.D. Pa. 1989), and on the eve of the close of discovery and the filing of motions for summary judgment, <u>The</u> <u>Development Group, LLC v. Franklin Tp. Bd. of Sup'rs</u>, WL 1773720, *2 -3 (E.D. Pa. 2004). Furthermore, courts should deny motions to amend where the amendment would be futile, meaning that it would be unable to "withstand a motion to dismiss." <u>Williams v.</u> <u>Philadelphia Housing Authority</u>, 826 F. Supp. 952, 954 (E.D. Pa. 1993) (noting that it is proper to "consider the proposed amendment's merits before determining whether to grant leave to amend").

Here Plaintiffs have waited until their opposition to Defendants' motion for summary judgment to request permission to amend their complaint. Although they claim that they only recently discovered the existence of Little Brownie Brokers and Flying Angels, Inc., it would be reasonable to deny the motion to amend on the grounds of untimeliness. Moreover, as discussed below, such an amendment would be futile, as Plaintiffs have failed to state a claim against either of the entities Plaintiffs wish to add as new Defendants.

Plaintiffs argue that Little Brownie Brokers and Flying

Angels, Inc., are liable under the "single employer theory," which authorizes courts to consolidate entities to "treat the assets and liabilities of each as belonging to a single entity" and to aggregate employees to reach the fifteen employee minimum required by Title VII. Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 85-86 (3d Cir. 2003). In the Third Circuit, single employer treatment is appropriate (1) when a company has split itself into separate entities for the purpose of evading Title VII; (2) when a parent company directed a subsidary's discriminatory acts; and (3) where "two or more entities' affairs are so interconnected that they collectively caused the alleged discriminatory employment practice." Id. at 86 (noting that "the question is whether the 'eggs'—consisting of the ostensibly separate companies—are so scrambled that we decline to unscramble them").

Although courts should consider financial entanglement since it will "bolster the case," the focus of the single employer inquiry typically rests on "the degree of operational entanglement—whether operations of the companies are so united that nominal employees of one company are treated interchangeably with those of another." Nesbit, 347 F.3d at 87-88. To ascertain the degree of "operational entanglement," courts look to:

> (1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (e.g., hiring and personnel matters), (2) whether they present themselves as a single company such that third parties dealt with

34

them as one unit, (3) whether a parent company covers
the salaries, expenses, or losses of its subsidiary,
and (4) whether one entity does business exclusively
with the other.

Id.

Plaintiffs claim that the Entity Defendants, including

Little Brownie Brokers and Flying Angels, Inc., are interrelated

because: (1) they share a common address; (2) they share common

management; (3) they are commonly owned; (4) Foodcrafters

paychecks are labeled "Foodcrafters Distributing Co/TPC"; (5)

there is one centralized human relations department in Apopka,

Florida; and (6) all human relations issues are addressed by the

Apopka, Florida location. In Plaintiffs' motion to amend, they

also claim intercompany transactions between Defendant Little

Brownie Properties, Inc., and Little Brownie Brokers, and between

Flying Angels and Defendant Foodcrafters. (Opp'n at 28.)

Plaintiffs have not alleged any of the three grounds that

would support treating the entities as a single employer.

Plaintiffs have not suggested that the entities are split for the

purposes of evading liability, nor have they alleged a parent-

subsidiary relationship. Although Plaintiffs appear to be

claiming operational entanglement, they have not alleged anything

beyond common management and ownership and have not addressed any

of the other "operational entanglement" factors or the

interchangeability of employees. See Nesbit, 347 F.3d at 88

(denying single employer status because plaintiff "sets out no

35

evidence—other than [the companies'] common ownership—suggesting that substantive consolidation would make sense under the factors discussed"). Accordingly, because Plaintiffs' requested amendments do not allege a claim against Little Brownie Brokers and Flying Angels, Inc., their motion to amend their complaint will be denied as futile and untimely.

## V. Motion to Consolidate

Plaintiffs move to consolidate this case with Lovenduski v. Foodcrafters Distributing Company, et al., 04-CV-2394 (JEI), on the basis that discovery has already been consolidated and because the witnesses and legal and factual issues will be substantially similar. Defendants do not oppose Plaintiffs' motion. (Reply at n. 5.)

Rule 42(a) gives the court authority to consolidate "actions involving a common question of law or fact . . . to avoid unnecessary costs or delay." Courts have "broad discretion" to consolidate cases, Malcolm v. National Gypsum Co., 995 F.2d 346, 350 (2d Cir. 1993), particularly where judicial economy outweighs the "potential for new delays, expense, confusion or prejudice." Easton & Co. v. Mut. Benefit Life Ins. Co., Nos. Civ. 91-4012, 92-2095, 1992 WL 448794, at *4 (D.N.J. Nov. 4, 1992); see also Wachtel v. Guardian Life Ins. Co., 223 F.R.D. 196, 199 (D.N.J. 2004) (consolidating two actions to avoid "confusion, unnecessary costs, and delay by promoting judicial economy") (citing Ellerman

<u>Lines Ltd., v. Atl. & Gulf Stevedores, Inc.</u>, 339 F.2d 673, 675 (3d Cir. 1964).

Because both cases involve the same allegations against the same Defendants, and because the cases are already consolidated for discovery purposes, Plaintiffs' motion to consolidate will be granted. <u>Lovenduski v. Foodcrafters Distributing Company, et al.</u>, 04-CV-2394(JEI), and <u>Equal Employment Opportunity Commission, et al. v. Foodcrafters Distribution Company, et al.</u>, 03-CV-2796(RBK), shall be consolidated for all purposes under <u>Equal Employment Opportunity Commission, et al. v. Foodcrafters Distribution Company, et al.</u>, 03-CV-2796(RBK).

The accompanying Order shall issue today.


Dated:    2/24/06          S/Robert B. Kugler
                           ROBERT B. KUGLER
                           United States District Judge

37